IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

|  |  |  |
|---|---|---|
| NORFOLK SOUTHERN RAILWAY CO., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | 1:08cv618 (JCC) |
| | ) | |
| | ) | |
| CITY OF ALEXANDRIA et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**M E M O R A N D U M   O P I N I O N**

At issue is a City of Alexandria ordinance that
purports to regulate the bulk transportation of ethanol, a
hazardous material, by Norfolk Southern Railway Company.  The
ordinance at issue prohibits hauling waste material, building or
construction supplies, bulk materials or commodities, heavy
vehicles or equipment not licensed for street use, or dirt,
debris, or fill "on all streets within the City" without a
permit.[1]  Violators are guilty of a class-two misdemeanor.  This
case presents itself by way of cross motions for summary
judgment.  The Court adopts the parties' stipulation of facts and
finds that the disputed ordinance, as applied to Norfolk Southern

---

[1] The full text of City of Alexandria Ordinance No. 4555, referred to
below as the "Ordinance," is attached as Appendix 1.

Railway, is preempted by federal law and is thus invalid.  The Court will grant in part and deny in part both motions.

## I. Background

The following undisputed facts are gathered from the record as a whole.  Norfolk Southern Railway Co. ("NSRC" or "Plaintiff") is a "rail carrier," as defined in the Interstate Commerce Commission Termination Act, engaged in interstate commerce.  It is also a "railroad carrier," as defined in the Federal Rail Safety Act, operating an interstate railroad system in multiple states.  Defendant City of Alexandria ("City") is a municipal corporation organized and existing pursuant to Title 15.2 of the Code of Virginia.  Defendant Richard Baier ("Baier") is the Director of the Department of Transportation and Environmental Services for the City.  Third-party defendant RSI Leasing, Inc. ("RSI") is a contractor of NSRC.

Plaintiff's interstate railroad system includes the Van Dorn Yard ("Yard") in Alexandria, Virginia.  The Yard contains a segregated area ("Facility") used for transloading ethanol shipped to the Yard via Plaintiff's rails from rail tank cars to tank trucks ("Trucks").  "Transloading" is a term of art in the bulk transportation industry that refers to the transfer of bulk shipments from a container moved by one mode of transportation to

that moved by another, at a terminal interchange point.[2]  Ethanol is classified and regulated as a flammable, hazardous material by the United States Department of Transportation ("DOT").  49 C.F.R. § 172.101.

Shippers contract with NSRC to have ethanol shipped to the Yard and transloaded from rail tank cars into the Trucks, which transport the ethanol to its next destination.  Each rail car can hold approximately 29,000 gallons of ethanol, which fills approximately 3.5 Trucks.  The Facility can handle up to 20 tank cars and can transload up to three rail cars at a time.  NSRC includes the charge for transloading in its overall price for the transportation of ethanol.  All arrangements regarding the further transport by Truck are made between the shippers and receivers of ethanol and private trucking companies.

NSRC owns and controls the Facility but has entered into a contract with RSI for RSI to conduct the transloading operations on NSRC's behalf.  Ethanol transloading began at the Facility on April 9, 2008.  Transloading occurs from 7 a.m. to 6 p.m., but the Facility is capable of operation 24 hours a day, 365 days a year.  After ethanol is transloaded at the Facility, the Trucks travel over City roads to I-495 and I-95, and then on to further destinations.

---

[2] *See N.Y. Susquehanna & W. Ry. v. Jackson*, 500 F.3d 238, 242 (3rd Cir. 2007) (*quoting* U.S. Dep't of Transp., Fed. Highway Admin., Freight Prof'l Dev. Prog., Freight Glossary, *available at* http://ops.fhwa.dot.gov/freight/FPD/glossary/index.htm).

3

Ethanol poses unique fire and spill-response hazards that require specialized equipment and training.  An accident on City streets involving a Truck transporting ethanol would pose a serious risk of injury to persons and property, depending on the circumstances of the accident.  An elementary school, playing fields, the Van Dorn Street Metro Station, and several businesses are all located within 1,000 feet of the Facility.  There is also a high-density residential neighborhood within 1,000 feet of the Facility and another within one-half mile of the Facility.  A number of community parks and recreation facilities are situated within one mile of the Facility.

On April 29, 2008, the City informed NSRC that "bulk tank trucks leaving the facility" would require a permit under City Ordinance 5-2-27 ("Original Ordinance").  NSRC believed that the Original Ordinance did not govern its activities and it did not apply for a haul permit from the City.  Nevertheless, on June 3, 2008, the City issued a thirty-day permit for the Facility.  On June 14, 2008, the City amended the Original Ordinance to apply to all bulk materials ("Ordinance").  On its face, the Ordinance applies to Trucks hauling ethanol from the Facility.

Since it enacted the Ordinance, the City has issued a series of additional thirty-day haul permits pursuant to it ("Permits").  The Permits all contain identical terms, but have been alternatively issued to NSRC, RSI, and three independent

4

trucking companies.  The Permits contain the following restrictions: (1) a copy of the permit must be provided to each Truck driver, (2) hauling is permitted Monday through Friday, 7 a.m. to 7 p.m. only, (3) a maximum of 20 trucks may haul ethanol from the Facility each day, and, (4) the hauling route is from the Facility to Metro Road, west on Eisenhower Avenue, south on Van Dorn Street, and out of the City limits.  NSRC has not complied with these terms.

Plaintiff filed a complaint against the City and Baier on June 16, 2008 ("Complaint").  The Complaint alleges that the Original Ordinance does not apply to ethanol hauling and that the Ordinance is preempted by a number of federal statutes.  The City filed an answer, a third-party complaint against RSI, and counterclaim against NSRC on June 25, 2008.  NSRC and RSI filed a Motion for Summary Judgment on November 24, 2008.  The City filed its own Motion for Summary Judgment on the same day.  These matters are currently before the Court.

## II.  Standard of Review

Summary judgment is appropriate only if the record shows "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Evans v. Techs. Apps. & Serv. Co.*, 80 F.3d 954, 958-59 (4th Cir. 1996).  A genuine issue of material

fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party seeking summary judgment has the initial burden to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  To defeat a properly supported motion for summary judgment, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Id.* (quotation omitted).  The facts shall be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party.  *Id*. at 255; *see also Lettieri v. Equant Inc.*, 478 F.3d 640, 642 (4th Cir. 2007).

### III. Analysis

The Complaint alleges five claims for relief and asks for a judgment declaring that: that the Original Ordinance is inapplicable to ethanol hauling (Count I), the Original Ordinance is void for vagueness and denies Plaintiff due process under the Fourteenth Amendment (Count II), the Ordinance is preempted by the Federal Rail Safety Act (Count III), the Ordinance is preempted by the Interstate Commerce Commission Termination Act (Count IV), and the Ordinance is preempted by the Hazardous Materials Transportation Act (Count V).  Both parties move for summary judgment in their favor on all counts.  The Court will address each count in turn.

A.   Count I: Original Ordinance Does Not Apply to NSRC's Ethanol Operations

The Original Ordinance prohibited hauling (1) waste materials, (2) building or construction supplies, materials or equipment of any type, or (3) dirt, debris, or fill of any type "on all streets within the city" without a permit.  § 5-2-27(a). Violators were guilty of a class-two misdemeanor.  § 5-2-27(d). Plaintiff claims that this ordinance does not apply to the Yard, the Facility, or Trucks accessing the Facility, because ethanol does not fall into any of these three categories.

The City disagrees, but argues that this claim is moot because the City amended the disputed regulation to include the hauling of "bulk materials or commodities of any type," which clearly encompasses ethanol.  § 5-2-27(a).  The City also states that it issued only one Permit pursuant to the Original Ordinance and that that Permit expired on July 3, 2008.  Plaintiff avers that its claim is not moot because the City continues to assert that the first Permit "has continued effectiveness and applicability."  Compl. at ¶ 44.  It does not, however, explain where or how the City makes this claim.

The Court finds that Count I is moot because the City amended the relevant portion of the ordinance and the permit issued to NSRC under the Original Ordinance is no longer in effect.  *See Valero Terrestrial Corp. v. Paige*, 211 F.3d 112, 116 (4th Cir. 2000) (internal quotation and citation omitted)

7

(finding that "statutory changes that discontinue a challenged practice are usually enough to render a case moot, even if the legislature possesses the power to reenact the statute after the lawsuit is dismissed, unless a defendant openly announces its intention to reenact precisely the same provision . . . "). As there is no allegation by either party that the City has announced its intention to reenact this provision, the Court will grant its motion for summary judgment on this claim.

B.    Count II: Original Ordinance Denies NSRC and RSI Due
      Process of Law under the Fourteenth Amendment

Plaintiff argues that, "[a]s construed by [the City]," the Original Ordinance "is so vague that it could be selectively construed and enforced without fair warning so as to deprive NSRC of due process as guaranteed by the Fourteenth Amendment of the United States Constitution." Compl at ¶ 47. Plaintiff also submits that "no reasonable construction of the [Original O]rdinance could result in its application to NSRC or [the] Facility." Id. at ¶ 48. For the reasons discussed in section III.A, this claim is also moot. The Court will grant the City's motion for summary judgment on Count II.

C.    The Presumption Against Preemption

The City first argues that it is entitled to a presumption against federal preemption of its traditional authority to promote the health, safety, and welfare of its residents. It is true that the consideration of federal

8

preemption "starts with the basic assumption that Congress did not intend to displace state law." *Bldg. & Constr. Trades Council v. Assoc. Builders & Contractors*, 507 U.S. 218, 224 (1993); *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981).  This assumption, however, only applies to those "field[s] which the States have traditionally occupied." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996).  Within such fields, "the historic police powers of the States [a]re not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id.* (internal quotations and citation omitted).

     As aptly noted by the Eleventh Circuit, when determining which areas have historically belonged to the states, "we must be mindful that we are part of the delicate process of adjusting the interacting areas of National and State authority over commerce.  The inevitable extension of federal authority over economic enterprise has absorbed the authority that was previously left to the States." *Fla. E. Coast Ry. v. City of W. Palm Beach*, 266 F.3d 1324, 1328 at n.1 (11th Cir. 2001) (*quoting Bethlehem Steel Co. v. N.Y. State Labor Relations Bd.*, 330 U.S. 767, 779-80 (1947)).

     There is a significant history of federal authority over the railways, *United States v. Locke*, 529 U.S. 89, 108 (2000), although the "virtual exclusivity of federal regulation [over railways] is a recent phenomenon," *Fla. E. Coast Ry.*, 266

F.3d at 1327-29 (citation omitted).  There is also a more recent, but nonetheless strong, pattern of federal authority over the transportation of hazardous substances.  *See* Transp. Safety Act of 1974, Pub. L. 93-633, 88 Stat. 2156 (Jan. 3, 1975); *Consol. Rail Corp. v. Bayonne*, 724 F. Supp. 320, 330 (D. N.J. 1989) ("The extent of federal regulation in the area of transportation, loading, unloading and storage of hazardous materials is comprehensive.").

In addition, the application of a presumption against federal preemption of state law should ultimately be guided by the congressional purpose behind each federal act.  *Medtronic*, 518 U.S. at 485-86 (citation omitted).  A court should discern this purpose primarily from "the language of the pre-emption statute and the 'statutory framework' surrounding it."  *Id.* (*quoting Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 111 (1992) (Kennedy, J., concurring in part and concurring in judgment)).  Also relevant is the overall "structure and purpose of the statute," as revealed through the text and a "reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law."  *Medtronic*, 518 U.S. at 486 (internal quotations and citation omitted).  With these principles in mind, the Court will proceed with an analysis of the remaining three counts of the Complaint.

D.    <u>Count III: Federal Rail Safety Act Preemption</u>

Count III claims that the Ordinance is preempted by the Federal Rail Safety Act of 1994 ("FRSA"), 49 U.S.C. §§ 20101-53. The FRSA exists "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." *Id.* at § 20101.  To achieve this end, Congress provided that "[l]aws, regulations, and orders related to railroad safety and [security] shall be nationally uniform to the extent practicable."  *Id.* at § 20106(a)(1).  The FRSA preempts all non-federal regulations "related to railway safety," with two specific exceptions.  *Id.* at § 20106(a)(1)-(2).

The first exception provides that "[a] State may adopt or continue in force a law, regulation, or order related to railroad safety or security until" either the Secretary of Transportation [("SOT")] or Secretary of Homeland Security [("SOHS")] issues an order or regulation "covering the subject matter of the State requirement."  *Id.* at § 20106(a)(2).  Second, "[a] State may adopt or continue in force an additional or more stringent law, regulation, or order" that is necessary to eliminate or reduce an essentially local safety or security hazard, if the state law is not incompatible with the federal regulation and does not unreasonably burden interstate commerce. *Id.*

11

1.   *Municipal Authority*

To determine whether either of these exceptions apply, the Court must interpret the world "State" as used in § 20106. Plaintiff argues that the two exceptions apply only to regulation by the 50 States and that Congress intended the FRSA to preempt *all* regulation of railroad safety by municipalities, such as the City.

The Court agrees: Congress specifically employed the term "State" in this section of the FRSA and provided two exceptions to general FRSA preemption for "State" regulations that it found to be consistent with railway safety.  49 U.S.C. § 20106(a).  There is no evidence that, by using the word "State," Congress intended to provide every locality within a state with the independent authority to regulate railway safety. The weight of the past twenty years of authority supports this interpretation.  *See, e.g.*, *CSX Transp., Inc. v. City of Plymouth*, 86 F.3d 626 (6th Cir. 1996); *Donelon v. New Orleans Terminal Co.*, 474 F.2d 1108, 1111 (5th Cir.), *cert. denied*, 414 U.S. 855 (1973); *City of Covington v. Chesapeake & Ohio Ry.*, 708 F. Supp. 806 (E.D. Ky. 1989); *CSX Trans., Inc. v. City of Tullahoma*, 705 F. Supp. 385 (E.D. Tenn. 1988); *S. Pac. Trans. Co. v. City of Baldwin*, 685 F. Supp. 601 (W.D. La. 1987); *Consol. Rail Corp. v. Smith*, 664 F. Supp. 1228 (N.D. Ind. 1987); *Johnson*

*v. S. R.R.*, 654 F. Supp. 121 (W.D.N.C. 1987); *Sisk v. Nat'l R.R. Passenger Corp.*, 647 F. Supp. 861 (D. Kan. 1986).

Further, the clearly-stated intent of the FRSA preemption provision, to make railway safety regulations "nationally uniform to the extent practicable," 49 U.S.C. § 20106(a)(1), would be defeated if every local government with some connection to a railway had the authority to make and enforce its own unique railway safety regulations. As aptly stated in *City of Thorsby*, 741 F. Supp at 891, "separate municipal regulation [] is so greatly at odds with the Congressional purpose of uniformity as to need no further argument."[3]

Because the term "State" in the FRSA does not include political sub-divisions of states, such as the City, neither of the two statutory exceptions to preemption included in the FRSA, 49 U.S.C. § 20106(a)(2), applies to the Ordinance.

2.   *Regulation that "Relates to Railway Safety"*

This finding is of little import, however, unless the Ordinance regulates activity that "relates to railway safety." If it does not, the FRSA has no preemptive effect here. The Supreme Court has stated that FRSA "pre-emption will lie only if

---

[3] The City does not assert that the Commonwealth of Virginia has delegated its authority to regulate railway safety to the City. Thus, the Court need not address Plaintiff's argument that states are prohibited from so delegating their authority.

the federal regulations substantially subsume the subject matter of the relevant state law." *Norfolk S. Ry. v. Shanklin*, 529 U.S. 344, 351 (2000) (*citing CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993) (internal quotations omitted)).  To "substantially subsume" it, "the federal regulation must 'cover' the same subject matter, and not merely 'touch upon' or 'relate to' that subject matter."  *Id.*

        Plaintiff argues that the FRSA and relevant federal regulations "cover" the subject matter governed by the Ordinance. To support this argument, it cites a number of federal regulations that it claims govern the Facility and the time and frequency of ethanol transloading at the Facility.  *See, e.g.*, 49 C.F.R. §§ 171.1, 171.8, 174.14, 174.16, 174.67.[4]  Section 174.14(a), "Movements to be expedited," provides that "[a] carrier must forward each shipment of hazardous materials promptly and within 48 hours (Saturdays, Sundays, and holidays excluded), after . . . receipt at any yard, transfer station, or interchange point."  49. C.F.R. § 174.14(a).  Section 174.16 provides that "[a] carrier shall require the consignee of each

_____

        [4] These regulations were enacted pursuant to the Federal Hazardous Materials Transportation Act ("HMTA"), 49 U.S.C. 5101 *et seq.*, which authorizes the SOT to establish regulations for the safety and security of hazardous materials ("Hazmat") in commerce.  FRSA preemption may apply through these regulations, even though they were "expressly promulgated pursuant to the [HMTA]."  *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 663 n.4 (1993); *see also CSX Transp., Inc. v. Williams*, 406 F.3d 667, 671 n.6 (D.C. Cir. 2005) *CSX Transp., Inc. v. Pub. Utils. Comm'n of Ohio*, 901 F.2d 497, 503 (6th Cir. 1990).

shipment of hazardous materials to remove the shipment from
carrier's property within 48 hours (exclusive of Saturdays,
Sundays, and holidays) after notice of arrival has been sent or
given." *Id.* at § 174.16.  If not so removed, the carrier shall
immediately "store hazardous materials on its property." *Id.*
Section 174.67 provides a number of detailed safety procedures
and requirements for methods of transloading hazardous materials.
*Id.* at § 174.67.  Section 171.1 applies Hazmat regulations to all
"transportation functions," which it carefully defines.  *Id.* at
§ 171.1(c)(1)-(4).  Section 171.8 defines, *inter alia*, applicable
terms such as "transloading," "storage," and "transportation."
*Id.* at § 171.8.

        In addition to citing the federal Hazmat regulations
discussed above, Plaintiff also argues that the conditions
imposed by the Permits inconvenience its operations.  In essence,
Plaintiff submits that the Ordinance affects railway safety
because it limits the amount of ethanol that can be moved into
and out of the Facility each day, requiring Plaintiff either to
store more ethanol at the Facility or decrease the amounts
received by it.

        The Court, however, remains unconvinced that the
Ordinance's requirements are "substantially subsumed" by these
regulations.  While the federal Hazmat regulations noted above
undoubtedly apply to the Facility and its transloading

15

operations, they only generally require the expedited forward movement of hazardous materials.  The Ordinance does not prevent such expediting.  It merely requires Plaintiff to take its transloading capacity, as limited by the Permits, into account when complying with the expediting requirements.  Like two ships passing in the night, the contents of the regulations cited by Plaintiff do not "cover," but instead merely "relate to," the subject matter of the Ordinance.  The Permits do not run up against federal regulations in a way that would allow the Court to find that the Ordinance is preempted by the FRSA.

*In re Vermont Railway* comes to a similar conclusion. 769 A.2d 648, 655 (Vt. 2000).  That court held that municipal zoning regulations specifying the routing of trucks hauling salt from a rail yard, the number of trucks that may exit the rail yard, and the hours during which trucking could occur were not preempted by the FRSA.  It determined that the municipal requirements did "not interfere with railway operations; they merely address[ed] traffic issues and concerns with environmental contamination, matters properly within the province of municipalities by virtue of the state's delegation of its traditional police powers."  *Id.*  It also noted that the plaintiff had failed to "point to any conditions that conflict with specific federal regulations regarding railway safety."  *Id.* Here, in contrast, Plaintiff has attempted to point out such

16

conflicts, but its attempts are unconvincing for the reasons discussed above.

Finally, both parties rely on *CSX Transportation, Inc. v. City of Plymouth*, 86 F.3d 626 (6th Cir. 1996), to support their positions in favor of and against FRSA preemption. In *Plymouth*, the Sixth Circuit found that a city ordinance prohibiting trains from obstructing a street for longer than five minutes and requiring five minutes between obstructions was preempted by the FRSA. *Id.* at 627. It noted that the Plymouth ordinance did not refer to railroad safety, but ultimately found that it "unquestionably relate[d] to railroad safety, . . . even though this relationship is . . . only indirect." *Id.* at 629-30. To reach this result, the *Plymouth* court analyzed the terms of the disputed ordinance and what it required the railway to do to comply. *Id.* at 629; *see also Norfolk & W. Ry. Co. v. City of Oregon*, 1998 WL 381510, at *3 (6th Cir. June 24, 1998). It ultimately found that "compliance [with the ordinance]. . . would require either shorter or faster trains" and the evidence showed that such acts would affect accident rates, implicating railway safety. *Id.*

Even were the Court to apply this type of "compliance analysis" to the Ordinance, it would not change the result. In order to comply, NSRC would have to decrease the number of Hazmat-carrying rail cars entering the Facility. There is no

17

evidence on the record showing whether or how this action would impact railway safety.  Further, the Sixth Circuit acknowledged that the ordinance at issue in *Plymouth* only had an indirect relationship to railway safety.  The relationship between the regulations cited by Plaintiff and the City's permit requirement for Hazmat hauling on its streets is even more distant, and too attenuated to "substantially subsume" the same subject matter. The Court finds that the Ordinance, as applied here, is not preempted by the FRSA.

    E.    <u>Count IV: Interstate Commerce Commission Termination<br>Act Preemption</u>

      The Interstate Commerce Commission Termination Act ("ICCTA"), 49 U.S.C. § 10101 *et seq.*, gives exclusive jurisdiction over "(1) transportation by rail carriers . . . and (2) the construction, acquisition, operation, abandonment, or discontinuance of . . . tracks, or facilities" to the Surface Transportation Board ("STB").  *Id.* at § 10501(b).  The remedies provided by the ICCTA "with respect to the regulation of rail transportation are exclusive and preempt the remedies provided under Federal and State law."  *Id.*

      Within the ICCTA, "transportation" by rail carriers includes, in relevant part, (A) a locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of property by rail, regardless of ownership or an agreement

18

concerning use; and (B) services related to that movement, including receipt, delivery, elevation, transfer in transit, storage, handling, and interchange of property. *Id.* at § 10102(9).

Plaintiff relies on this definition to argue that the Facility and the transloading process are included in "transportation by rail carriers," as defined in 49 U.S.C. § 10501(b). Therefore, it claims, the Ordinance is preempted by the ICCTA's general preemption provision because it allows the City to regulate these activities by restricting the times at which Trucks may depart the Facility and the route on which they may they drive through the City, and by imposing other "conditions and restrictions, as the director may deem appropriate to promote traffic safety." § 5-2-27(b).

As noted above, the ICCTA gives the STB exclusive jurisdiction over "(1) transportation by rail carriers . . . and (2) the construction, acquisition, operation, abandonment, or discontinuance of . . . tracks, or facilities." A number of jurisdictions have acknowledged that, with this section, Congress intended ICCTA preemption of these areas to be "complete [and] to the exclusion of the states." *CSX Transp., Inc. v. Ga. Public Serv. Comm'n*, 944 F. Supp. 1573, 1584 (N.D. Ga. 1996); *see also City of Auburn v. United States*, 154 F.3d 1025, 1030 (9th Cir. 1998), *cert. denied*, 527 U.S. 1022 (1999) (affirming STB ruling

19

that local environmental regulation of rail lines was preempted); *Flynn v. Burlington N. Santa Fe Corp.*, 98 F. Supp. 2d 1186, 1189 (E.D. Wash. 2000) (holding that the court lacked subject matter jurisdiction over the permitting of a railroad refueling facility because Congress vested exclusive jurisdiction over railroad transportation in the STB); *Soo Line R.R. v. City of Minneapolis*, 38 F. Supp. 2d 1096, 1101 (D. Minn. 1998) (finding local permitting regulations regarding the demolition of five buildings preempted by the ICCTA); *Burlington N. Santa Fe Corp. v. Anderson*, 959 F. Supp. 1288, 1296 (D. Mont. 1997) (holding that the ICCTA preempts Montana law authorizing a state agency to exercise regulatory authority over railroad agencies).

"In contrast, manufacturing activities and other facilities owned by railroads which are not integrally related to the railroad's provision of interstate rail service, i.e., non-transportation facilities, are not subject to STB jurisdiction or [] federal preemption."  *Flynn v. Burlington N. Santa Fe Corp.*, 98 F. Supp. 2d 1186, 1189 (E.D. Wash. 2000) (*citing* Borough of Riverdale - Petition for Declaratory Order - N.Y., Susquehanna & W. Ry., STB Finance Docket No. 33466, 1999 WL 715272, at *10 (S.T.B. Sept. 9, 1999)).

Notwithstanding the broad ICCTA preemption, however, both transportation and non-transportation activities and facilities can be subject to some state and local regulation.

20

For example, local electrical, building, fire, and plumbing codes are generally not preempted.  *Id.* (*citing* Borough of Riverdale, at 8-9; *Village of Ridgefield Park v. N.Y., Susquehanna & W. Ry.*, 750 A.2d 57, 65-66 (N.J. 2000)).  The ICCTA generally allows the exercise of the local police power to protect the health and safety of the local community so long as the local regulation does not (1) unreasonably burden rail carriage, or (2) discriminate against rail carriage.  *N.Y., Susquehanna & W. Ry. v. Jackson*, 500 F.3d 238, 254 (3d Cir. 2007) (*citing Green Mtn. R.R. v. Vermont*, 404 F.3d 638, 642 (2d Cir. 2005); Cities of Auburn and Kent, Washington - Petition for Declaratory Order - Burlington N. R.R., STB Finance Docket No. 33200, 1997 WL 362017, at *10 (S.T.B. July 1, 1997)).

Thus, to resolve the question of whether the ICCTA preempts the Ordinance, the Court must determine whether the Ordinance (1) regulates transportation or the operation of tracks or facilities by rail carriers, but (2) is nevertheless not subject to federal preemption because it is an exercise of the local police power to protect the health and safety of the local community that does not (a) unreasonably burden, or (b) discriminate against, rail carriage.

1. *Whether the Ordinance Regulates Railroad Transportation*

The first question is whether the activities and facilities regulated by Permits issued under the Ordinance

21

constitute railroad "transportation" or "facilities," as defined in the ICCTA.  49 U.S.C. § 10501(b).  The Court finds that, under the ICCTA's definition of "transportation," the Facility and its transloading operations are transportation facilities.  49 U.S.C. § 10102(9).  The Facility is "related to the movement of property by rail, regardless of ownership or an agreement concerning use."[5]  *Id.*  Without a location at which to unload ethanol from the rail cars, ethanol could not be successfully transported by rail.  Further, transloading is certainly a "service[] related to that movement, including receipt, delivery, elevation, transfer in transit, storage, handling, and interchange of property."  *Id.*

Several courts have found similarly: that the transloading and storage of items shipped by rail are part of the "transportation by rail carriers" and the "operation of . . . tracks or facilities."  *See Green Mtn. R.R. v. Vermont,* 404 F.3d 638, 642 (2d Cir. 2005); *R. R. Ventures, Inc. v. Surface Trans. Bd.,* 299 F.3d 523, 530 (6th Cir. 2002); *City of Auburn v. United States,* 154 F.3d 1025, 1029-31 (9th Cir. 1998).  The Third Circuit specifically stated that "transloading qualifies as

_____

[5] The Court notes that, after the parties' cross-motions for summary judgment were briefed and argued, but before the Court issued its opinion in this matter, the STB determined "that the operation of an ethanol transloading facility owned by [NSRC] within the City [] constitutes transportation by rail carrier."  The City of Alexandria, Virginia - Petition for Declaratory Order, STB Finance Docket No. 35157 (S.T.B. Feb. 17, 2009).

transportation" under the ICCTA.  *N.Y. Susquehanna & W. Ry. v. Jackson*, 500 F.3d 238, 242 (3d Cir. 2007).

Finally, the situation presented here contrasts markedly with that in *Fla. E. Coast Ry.*, where the permittee's use of the rail yard "serve[d] no public function and provide[d] no valuable service to [the railroad]" because it merely involved the permittee's "operation of a private distribution facility on [railroad]-owned premises."  266 F.3d at 1327-29.  NSRC and RSI's operation of the Facility is a public function.  They do not operate a private facility from which to distribute their own products, but rather enable ethanol purchasers to take possession of their product and forward it on as necessary.  The Facility and its transloading operations help NSRC carry out its role as a common carrier.

2.   *Purpose of the Ordinance*

Because, as found above, the Facility and its transloading operations are rail transportation facilities under the ICCTA, state and local regulation of them may be federally preempted.  To determine whether the specific local regulation at issue here is preempted, the Court must determine whether the Ordinance, as applied, is a proper exercise of local police power that does not (a) unreasonably burden, or (b) discriminate against, rail carriage.  *See N.Y. Susquehanna & W. Ry. v. Jackson*, 500 F.3d at 254.

23

First, the City asserts that the Ordinance is a proper exercise of its traditional local police power.  It cites a number of other jurisdictions that have reviewed various local ordinances and found them not preempted by the ICCTA.  *See Emerson v. Kansas City S. Ry.*, 503 F.3d 1126, 1129 (10th Cir. 2007) (finding that the ICCTA did not preempt state trespass, nuisance, and negligence claims against railroad for improper disposal of railroad ties); *Fla. E. Coast Ry.*, 266 F.3d at 1337 (holding that zoning and occupational ordinances applied to a railway lessee operating a private distribution center for its own products were not preempted); *CFNR Op. Co. v. City of Am. Canyon*, 282 F. Supp. 2d 1114, 1116 (N.D. Cal. 2003) (declining to issue preliminary injunction to railway lessee because disputed permit was not aimed at rail operations); *In re Vt. Ry.*, 769 A.2d 648, 655 (Vt. 2000) (holding that municipal zoning ordinances are not preempted by ICCTA).

Other courts, however, have found that the ICCTA does preempt local regulations when those regulations require railroads to obtain conditional use permits before taking certain actions.  *See, e.g.*, *Green Mtn. R.R. v. Vermont*, 404 F.3d 638, 638 (2d Cir. 2005) (affirming ICCTA preemption of an environmental pre-construction permitting requirement); *City of Auburn v. United States*, 154 F.3d 1025, 1030-31 (9th Cir. 1998) (finding ICCTA preemption of a local environmental permitting

24

requirement); *Soo Line R.R. v. City of Minneapolis*, 38 F. Supp. 2d 1096, 1101 (D. Minn. 1998) (finding a city demolition permitting process preempted by the ICCTA); *CSX Transp., Inc. v. Ga. Pub. Serv. Comm'n*, 944 F. Supp. 1573, 1585 (N.D. Ga. 1996) (holding that a state pre-approval process for modification of railroad agencies was preempted by ICCTA).

In these cases, advance permitting requirements directed at ICCTA-covered activities and facilities were not excused as mere exercises of local police powers. *Id.* Even when implemented to address local health and safety, courts found that permitting processes "unduly interfere with interstate commerce by giving the local body the ability to deny the carrier the right to construct facilities or conduct operations." *Green Mtn. R.R.*, 404 F.3d at 643 (*quoting Green Mtn. R.R. v. Vermont*, 2003 U.S. Dist. LEXIS 23774, at *13 (internal quotations and citation omitted)). They also found that they "can be time-consuming, allowing a local body to delay construction of railroad facilities almost indefinitely." *Id.; see also N.Y., Susquehanna & W. Ry. v. Jackson*, 500 F.3d 238, 254-55 (3d Cir. 2007) (applying the same analysis to ICCTA preemption of a non-construction permitting scheme).

The Ordinance imposes a permitting requirement on the effective operation of the Facility, making highly relevant the line of cases that has found permitting requirements aimed at

railway operations to be preempted.  The cases cited by the City are easily distinguished because they addressed different types of local regulation than that advanced here.

In addition, the STB has explicitly found that the ICCTA can preempt state and local permitting or preclearance requirements "because by their nature they unduly interfere with interstate commerce."  Joint Petition for Declaratory Order - Boston and Maine Corp. & Town of Ayer, STB Finance Docket No. 33971, 2001 WL 458685, at *5 (S.T.B. Apr. 30, 2001), *aff'd, Boston & Maine Corp. v. Town of Ayer*, 191 F. Supp. 2d 257 (D. Mass. 2002); *see also* Green Mtn. R.R. - Petition for Declaratory Order, STB Finance Docket No. 34052, 2002 WL 1058001, at *4-5 (S.T.B. May 24, 2002).

In a recent decision addressing the preemptive scope of the ICCTA, the STB held that "any form of state or local permitting or preclearance that, by its nature, could be used to deny a railroad the ability to conduct some part of its operations or to proceed with activities that the Board has authorized" is "preempted regardless of the context or rationale for the action."  *Emerson v. Kansas City S. Ry.*, 503 F.3d 1126 (10th Cir. 2007) (*citing* CSX Transp., Inc., Petition for Declaratory Order, STB Finance Docket No. 34662, 2005 WL 1024490, at *2-4 (S.T.B. May 3, 2005)).

26

The Court notes that the STB, as the agency Congress authorized to administer the ICCTA, is "uniquely qualified to determine whether state law . . . should be preempted" by that Act. *Green Mtn. R.R.*, 404 F.3d at 643 (*quoting Medtronic, Inc. v. Lohr*, 518 U.S. 470, 496 (1996) (finding the same with respect to the Food and Drug Administration, as the agency Congress authorized to administer the Federal Food, Drug, and Cosmetic Act)). The STB has come down clearly for preemption of permitting requirements aimed at railway operations.

In light of all this authority, it is clear that the Ordinance is not a proper exercise of the local police power.[6] While the Ordinance's restrictions relate to local health and safety, that purpose is not dispositive here. *See Emerson v. Kansas City S. Ry.*, 503 F.3d at 1129. In addition, the Ordinance affords the City nearly unlimited discretion regarding when and under what conditions to grant permits. As in *Green Mountain Railroad*:

> [T]he railroad is restrained from [its activities] until a permit is issued; the requirements for the permit are not set forth in any schedule or regulation that the railroad can consult in order to assure compliance; and the issuance of the permit awaits and depends upon the discretionary rulings of a local agency.

---

[6] Because the Court finds that the Ordinance, as applied here, is not a proper exercise of the local police power, a presumption against federal displacement of fields of law which the States have traditionally occupied cannot apply. Even if it did, the Permit requirements clearly conflict with federal law and any presumption would be easily overcome.

27

404 F.3d at 643.   Thus, as in the other permitting cases cited here, the Court finds that the Ordinance, as applied to Plaintiff and Trucks departing from its Facility, is preempted by the ICCTA and is invalid.

    F.   <u>Count V: Preemption by the Hazardous Materials Transportation Act</u>

    The Hazardous Materials Transportation Act ("HMTA"), 49 U.S.C. § 5101 *et seq*., governs the movement of hazardous materials by all methods of transportation and protects against the inherent risks associated with such transportation.   *Id.* at § 5101.   The HMTA also contains two preemption provisions.   The first, § 5125(a), preempts Hazmat regulations imposed by states, subdivisions of states, and Indian tribes when, in relevant part, (1) it is not possible to comply with both the non-federal requirement and a HMTA requirement or, (2) the non-federal requirement, as applied or enforced, is an obstacle to carrying out the HMTA.   *Id.* at § 5125(a)(1)-(2).   The second preemption provision, § 5125(b), preempts *all* non-federal regulations addressing five enumerated topics if that are not substantively the same as an existing HMTA regulation.   *Id.* at § 5125(b)(1).

    1.   *49 U.S.C. § 5125(b)(1) Preemption*

    The Court will first address the more specific of these provisions, § 5125(b)(1).   Plaintiff argues that the Ordinance is preempted because it prescribes requirements on two of the five subjects specifically reserved to the HMTA without being

28

"substantially the same" as HMTA requirements.  According to
Plaintiff, the Ordinance regulates "the packing, repacking, [and]
handling" of hazardous material, *id.* at § 5125(b)(1)(B), by
imposing time constraints on transloading operations and limits
on how much hazardous material can be transloaded each day.
Plaintiff also argues that the Ordinance regulates the
preparation, execution, number, contents, placement, and use of
shipping documents, *id.* at § 5125(b)(1)(C), by requiring the
permit holder to distribute the permit to each driver and
requiring each driver to carry it.[7]

        The City submits that Plaintiff failed to point to any
specific HMTA regulation that addresses the pace or timing of
transloading, or the copying and distribution of local trucking
permits.  It argues that mere regulatory silence does not
establish § 5125(b) preemption; the SOT must promulgate an
affirmative decision not to regulate in a specific area to
trigger preemption.  This assertion has no merit.  The HMTA
preempts *all* regulation of "the packing, repacking, [and]
handling" of hazardous material and of the preparation,
execution, number, contents, placement, and use of shipping
documents, unless the HMTA and local regulations are very nearly

---

        [7] The Permits provide that "[a] copy of this Permit must be provided to
each driver."  Plaintiff's argument appears to be based on a reading of the
Permit that would require the drivers to retain this copy of the Permit and
carry it with them when hauling ethanol through the City.  The face of the
Permits do not require this.

identical.  49 U.S.C. § 5125(b)(1)(B)-(C).  The City seeks an exception for local regulation that addresses a subject not yet regulated with specificity under the HMTA.  Such an exception would defeat the purpose of § 5125(b) preemption and enable non-federal entities to enforce more numerous and more demanding requirements on the five enumerated topics than the federal government has chosen to impose.

Having disposed of the City's general argument against the application of § 5125(b) preemption in this case, the Court will next address whether the Ordinance actually regulates two categories of activities not subject to local regulation under § 5125(b).[8]

a.   <u>Subpart (C): Hazmat Shipping Documents</u>

Plaintiff submits that the Ordinance regulates the preparation, execution, number, contents, placement, and use of shipping documents, *id.* at § 5125(b)(1)(C), by requiring the permit holder to distribute the Permit to each driver and each driver to carry it.  Plaintiff asserts that this document is the equivalent of a local shipping authorization and is not substantially the same as any federal regulation because no relevant federal regulation requires local shipping documents or their distribution to Truck drivers.

---

[8] No party has argued that the Ordinance regulates the other three categories of activities not subject to local regulation under § 5125(b)

The City has not made any assertions about the purpose of this requirement, but it appears likely that the Director Baier mandated this to give Truck drivers notice of the routes that they are to drive through the City.  Whatever the purpose of this document, though, it is not a "shipping document" under § 5125(b)(1)(C).  This term is defined to include: "shipping order[s], bill[s] of lading, manifest[s], or other shipping document[s] serving a similar purpose and prepared in accordance with subpart C of part 172 of this chapter [49 C.F.R. §§ 172.200-172.205]."  49 C.F.R. § 171.8.  The Permit is none of the identified documents: a shipping order, bill of lading, or manifest.  It is also not prepared in accordance with the specified regulations.  *See* 49 C.F.R. §§ 172.200-172.205.

In addition, Courts have noted Congress's specific finding that "additional documentation and information requirements in one jurisdiction create unreasonable hazards in other jurisdictions and could confound shippers and carriers." *Colo. Public Utils. Comm'n v. Harmon*, 951 F.2d 1571, 1578 (10th Cir. 1991) (finding that two state documents, an inspection report and a fee-based permit, required for vehicles transporting Hazmat through that state, were not "shipping documents").  This further supports a reading of "shipping documents" under 49 C.F.R. § 171.8 that does not incorporate copies of the Permits distributed to Truck drivers.  Because the Permit does not fall

within the category of specifically preempted areas in
§ 5125(b)(1)(c), the Court finds that the Ordinance is not
preempted by 49 U.S.C. § 5125(b)(1)(C).

b. <u>Subpart (B): Handling of Hazmat</u>

Plaintiff also asserts that the Ordinance regulates
"the packing, repacking, [and] handling" of hazardous material,
*id.* at § 5125(b)(1)(B), by imposing time and quantity constraints
on Plaintiff's transloading operations.  Plaintiff submits that
transloading is a type of repacking and handling, and that the
Permits' requirements are not substantially the same as federal
requirements on this subject because no HMTA regulation imposes
these type of constraints on transloading Hazmat.  The Court
agrees.  "Packing" and "repacking" of Hazmat clearly includes the
process of transloading - transferring ethanol from the rail cars
in which it was transported to Trucks that will transport it to
its final destination.  *See also* 49 C.F.R. § 171.1(c)(2)-(4).

The City argues that the Ordinance and Permits only
address the movement of trucks hauling bulk through city streets,
not "packing, repacking, [or] handling."  This assertion is
unconvincing.  While the face of the Ordinance refers to hauling
bulk, the Permits themselves show that the City acted with a
different regulatory purpose when it issued the Permits.  First,
the Permits identify the location and purpose of the Facility as
a "transloading facility in Alexandria" from which ethanol is

32

hauled "to various locations via I-95."  Second, the City issued the Permits to NSRC and RSI, referencing various private trucking companies as "secondary contact[s]" on some of the Permits, rather than issuing the Permits directly to the haulers.  Pl.'s Mot. for Summ. J., Ex. 8 at 1-22.  Finally, City representatives made a number of public statements clearly conveying their underlying intent: to force Plaintiff to cease its transloading operations in the City.  *Id.* at 5-6 (*citing* City Council Meeting Video at 2:18:40; Minutes of May 27, 2008 City Council Meeting; Statement of the City Mayor and City Council on the NSRC Ethanol Transloading Facility).  The Permits thus appear to be aimed at the railroad and its operations, not the operations of the private trucking companies.

     The Permits also provide that they are "being issued despite city concerns and objection to Norfolk Southern and its contractors relating to the appropriateness of ethanol transloading at this location."  *Id.*  The numerous references to transloading at the Facility reveal the true aim of the Permits.[9] Finally, the Permits appear, on their face, only to apply to the hauling of ethanol from the Facility, rather than to all bulk materials going in or out of the Facility.  The Court finds that the Ordinance, as applied here, does regulate the transloading of

---

     [9] Again, because the Ordinance, as applied, is directed at the railways, a presumption against federal preemption of traditional areas of state authority cannot apply.  Even if it did, any presumption would be easily overcome.

ethanol at the Facility.  For this reason, it is preempted by 49 U.S.C. § 5125(b)(1)(B).

   2. *49 U.S.C. § 5125(a) Preemption*

   Plaintiff also argues that the Ordinance is preempted under the HMTA's more general preemption provision, 49 U.S.C. § 5125(a), because it is not possible for Plaintiff to comply with both the Permits' requirements and federal regulations regarding Hazmat transportation.  Plaintiff specifically points to 49 C.F.R. § 177.800(d), a regulation enacted pursuant to the HMTA. This regulation mandates that "[a]ll shipments of hazardous materials must be transported without unnecessary delay, from and including the time of commencement of the loading of the hazardous material until its final unloading at destination." *Id.*  Plaintiff asserts that the Permits, by restricting the number of Trucks that can leave the Facility each day, causes an unnecessary delay in the forward movement of ethanol that comes to the Facility.

   The City disagrees for two reasons.  First, it argues that the Ordinance is not an obstacle to NSRC's compliance with the HMTA or 49 C.F.R. § 177.800(d) because the Ordinance only regulates the manner in which Trucks can use the City's streets, not the railroad's transloading activities.  Second, it argues that any delay the Ordinance might cause in ethanol shipping is

minor and strictly necessary for the health and welfare of its
residents.

As noted above, § 5125(a) preemption only occurs if the
local regulation is an "obstacle to accomplishing and carrying
out" federal regulations.  49 U.S.C. § 5125(a)(2).  In applying
the obstacle test to determine preemption, the Supreme Court
examines whether the state law in question poses an "obstacle to
the accomplishment and execution of the full purposes and
objectives of Congress".  *Hillsborough County, Fla. v. Automated
Med. Lab., Inc.*, 471 U.S. 707, 713 (1985) (quotation omitted).

One of the objectives of the HMTA is "a uniform,
national scheme of regulation" to govern the transportation of
Hazmat.  *Chlorine Inst., Inc. v. Cal. Highway Patrol*, 29 F.3d
495, 496-97 (9th Cir. 1994); *S. Pac. Transp. Co. v. Public Serv.
Comm'n of Nev.*, 909 F.2d 352, 358 (9th Cir. 1990); *see also Nat'l
Tank Truck Carriers, Inc. v. Burke*, 608 F.2d 819, 824 (1st Cir.
1979) ("[T]here is strong support for the notion that a primary
Congressional purpose intended to be achieved through the
legislation was to secure a general pattern of uniform national
regulations.").  Further, "Congress expressly contemplated that
the Secretary of Transportation would employ his powers to
achieve safety by enhancing uniformity in the regulation of
hazardous materials transportation."  *Harmon*, 951 F.2d at 1580;

*see also CSX Transp., Inc. v. Williams*, 406 F.3d 667, 674-675 (D.C. Cir. 2005) (Henderson, J., concurring).

Relying on this broad purpose, other circuits have found that the HMTA preempted various local regulations because the local regulations constituted an obstacle to this overarching goal. *See Chlorine Inst., Inc. v. Cal. Highway Patrol*, 29 F.3d 495 (9th Cir. 1994); *N. States Power Co. v. Prairie Island Mdewakanton Sioux Indian Cmty*, 991 F.2d 458 (8th Cir. 1993); *Colo. Public Utils. Comm'n v. Harmon*, 951 F.2d 1571 (10th Cir. 1991); *S. Pac. Transp. Co. v. Public Serv. Comm'n of Nev.*, 909 F.2d 352 (9th Cir. 1990).

In line with these circuits, this Court recognizes national uniformity of Hazmat regulation as one of the primary Congressional purposes behind the HMTA. The Ordinance, as applied through the Permits, imposes time and quantity restrictions on Trucks transporting Hazmat through the City if they originate at the Facility. Neither party has cited a federal regulation that imposes such restrictions. Thus, the Ordinance implements additional and more restrictive regulation of Hazmat transportation than is nationally applied by the SOT. As such, the Ordinance inhibits and obstructs Congress's goal of uniform Hazmat regulation.

This is true regardless of the specific HMTA regulation noted by Plaintiff, which requires the prompt forward movement of

36

Hazmat.  What triggers § 5125(a) preemption is not merely a
conflict between specific federal and local regulations, but any
inhibition of the goal of the federal Act by local requirements.
It is well-established that "[t]he relative importance to the
State of its own law is not material when there is a conflict
with a valid federal law, for the Framers of our Constitution
provided that the federal law must prevail."  *Fidelity Fed. Sav.
& Loan Ass'n v. De La Cuesta*, 458 U.S. 141, 153 (1982) (*quoting
Free v. Bland*, 369 U.S. 663, 666 (1962)).  Because the Ordinance
clearly interferes with Congress's goal of national uniformity in
Hazmat regulations, the Court finds that it is preempted by 49
U.S.C. § 5125(a).

>    G.   Count V: Preemption for Failure to Comply with HMTA
>         Highway Designation Procedures

The HMTA also provides that "each State and Indian
tribe may establish, maintain, and enforce- (A) designations of
specific highway routes over which hazardous material may and may
not be transported by motor vehicle; and (B) limitations and
requirements related to highway routing."  49 U.S.C.
§ 5112(a)(2).  The Act instructs the SOT to prescribe
regulations, in accordance with nine standards set forth in the
Act, that States and Indian tribes must follow when making
highway designations.  *Id.* at § 5112(b).  These regulations are
implemented by the Federal Motor Carrier Safety Administration
(FMCSA) in 49 C.F.R. Part 397, Subparts C (Routing of Non-

Radioactive Hazardous Materials (NRHM)) & E (Preemption
Procedures).

The City agrees that it made no attempt to comply with
these highway-designation procedures, but asserts that it is not
required to do so.  It argues that these procedures govern only
state highway designations, not "site-specific, intra-
jurisdictional permits that only regulate the transportation of
hazardous materials from a point within the City to the nearest
highway."  City's Mem. in Supp. at 25.

The City did not completely develop this argument, but
if it is asserting that localities are not covered by 49 U.S.C.
§ 5112(a)(2), its argument has no merit.  HMTA regulations
clearly provide that "any highway routing designation affecting
the highway transportation of [NRHM], made by a political
subdivision of a State, is considered as one made by that State,
and all requirements of this subpart [C (Routing of NRHM)]
apply."  49 C.F.R. § 397.69(a) (Highway Routing Designations;
Preemption); *see also S. Blasting Servs., Inc. v. Wilkes County,
N.C.*, 162 F. Supp. 2d 455, 465 (W.D.N.C. 2001) (finding that a
county fire marshal's directive prohibiting Hazmat transport
during school hours was a HMTA-preempted routing designation).

The result is no different if the City is arguing that
"highway routes" do not include routes over local roads.  First,
"routing designation" is broadly defined in the regulations as

38

"[a]ny regulation, limitation, restriction, curfew, time of travel restriction, lane restriction, routing ban, port-of-entry designation, or route weight restriction, applicable to the highway transportation of [NRHM] over a specific highway route or portion of a route."  49 C.F.R. § 397.65.  Additionally, the term "highway," while not defined within the HMTA or the ensuing regulations, is generally any "free and public roadway or street that every person may use" and is used to distinguish public roadways from private ones.  Black's Law Dictionary 747 (8th ed).  Finally, Congress clearly included localities within the scope of 49 U.S.C. § 5112.  The Court will not find, as the City urges, that Congress's detailed federal route-designation process applies only to the federal interstate highway system.  *See also S. Blasting Servs., Inc.*, 162 F. Supp. 2d at 465 (applying the HMTA highway routing designation procedures to local North Carolina roads).

The City also asserts that the legislative history of this section of the HMTA shows that Congress did not intend for the HMTA to interfere with local jurisdictions' ability to regulate "purely local circumstances and conditions."  City's Mem. in Supp. at 25 (*citing* H.R. Rep. 101-444(II), Selected Provisions & I, 101st Cong., 2nd Sess. 1990).  A review of this legislative history, however, leads the Court to conclude that Congress intended to account for the "purely local circumstances

39

and conditions" about which it expressed concern through the HMTA's detailed route-designation process.  *See* H.R. Rep. 101-444(II), Selected Provisions & I, 101st Cong., 2nd Sess. 1990.

For these reasons, the HMTA also preempts the Ordinance, as applied in the Permits, because it contains route-designations that fail to comply with HMTA route-designation procedures.

## IV.   Conclusion

The Court will deny as moot NSRC and RSI's motion and grant the City's motion on Counts I and II, regarding the applicability of the Original Ordinance.  The Court will deny NSRC and RSI's motion and grant the City's motion as to Count III because the Court finds that the FRSA does not preempt the Ordinance.  Finally, the disputed ordinance is clearly preempted by at least two federal statutes, the ICCTA and the HMTA and the Court will thus grant NSRC and RSI's motion and deny the City's motion as to Counts IV and V.  The Ordinance, as applied to NSRC and Trucks departing the Facility, is invalid under federal law.

An appropriate Order will issue.


April 15, 2009                 _____/s/_____
Alexandria, Virginia                  James C. Cacheris
                             UNITED STATES DISTRICT COURT JUDGE